## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>　　　Plaintiff, | ) <br> ) <br> ) | Case No. 97-CR-1005(S-1)-01 |
| v. | ) <br> ) | Before U.S. District Court Judge <br> Raymond J. Dearie |
| JOHN PAPPA, <br>　　　Defendant. | ) <br> ) <br> ) | |

---

## DEFENDANT PAPPA'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE
## UNDER 18 U.S.C. § 3582(c)(1)(A)

Comes now the defendant, JOHN PAPPA, through undersigned counsel, and respectfully moves this Court to grant his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Because Judge Dearie has presided over the case since its inception and has insights into the case that another judge would not, Pappa respectfully requests that the Court rule on this motion rather than reassigning it.[1]

### INTRODUCTION

John Pappa is serving six concurrent life sentences for murders, racketeering, and narcotics crimes he committed between 1992 and 1997. Pappa committed these crimes when he was between 17 and 22 years old. He did so as a young, impressionable youth caught trying to impress members of the Colombo organized crime family. His upbringing and his youth were significant factors in his committing these admittedly heinous offenses.

---

[1] Pappa is filing this motion and asks that the Court order the government to respond within 15 days, thus by January 3, 2023. Pappa will then file a reply brief on January 5, 2023, within two days after the government has filed its response.

Pappa is now 48 years old and bears an unparalleled record of rehabilitation during the 25 years he has served in the custody of the Federal Bureau of Prisons ("BOP"). Despite facing multiple life sentences, Pappa has committed himself to a life of rehabilitation in prison, having a spotless prison record for nearly 25 years,[2] taking countless educational and behavioral classes, and teaching and mentoring other prisoners to overcome their past.

Pappa committed violent crimes, but he is not a violent criminal. His sentence of life imprisonment should be reconsidered, given his upbringing and youth at the time of the offense, the unusually long sentence he will serve, the sentencing disparity his sentence will create if left unchanged, the mandatory nature of the sentence (precluding the Court from considering mitigating circumstances at the time of sentencing), and his quite extraordinary efforts at rehabilitation. In short, Pappa is a changed man, deserving of a second chance, even as he stands convicted of horrible crimes that he committed as a reckless and immature young man.

## BACKGROUND

The crimes in this case arose as part of an internal war between opposing factions of the Colombo organized crime family that fought in the streets of New York in the early 1990s. During the war, two factions of the Colombo family were pitted against each other, with some of the family supporting Carmine Persico and others loyal to the acting boss, Victor J. Orena. Pappa was chiefly involved in this war from 1992 to 1994, when he was 17 to 19 years old, and Pappa was arrested in 1997 when he was 22 years old. *See United States v. Persico*, 266 F. Supp. 3d 632, 636 (E.D.N.Y. 2017) (describing the civil war among the Colombo family).

---

[2] Pappa received an incident report in his first year in prison for smoking a cigarette in an unauthorized area, a rather minor offense in the federal prison system. *See* Summary Reentry Plan – Progress Report, Appendix at A8. He has had no disciplinary infractions in over 24 years since then.

**A. Pappa's childhood was significantly impacted by his father's death, his stepfather's arrest and imprisonment, and his family's ties to organized crime.**

Pappa's father, Gerard Pappa, was killed when Pappa was five years old. *See* Letter of Kristina Pappa, App. A53.[3] He was shot. Pappa was told that his father walked into a convenience store in Brooklyn while it was being robbed and that burglars turned and shot him thinking it was the cops. *See* App. A54. But that was not the real story.

The real story was that Gerard Pappa was a member of the mafia with the Genovese crime family.[4] *See id.* The Colombo crime family shot him in retaliation because Gerard had murdered two members of that family over a drug-dealing dispute. Gerard was shot in the face so that his wife could not give him a proper Italian-Catholic wake with an open casket. Genovese crime family boss Vincent Gigante was suspected of ordering the hit on Gerard Pappa, but he was acquitted of the murder in 1997. *See* Richard Pyle, *Jury Finds Gigante Guilty of Racketeering*, ASSOCIATED PRESS NEWS (Jul. 25, 1997), https://apnews.com/article/80da1e401d4ba5cb2bd47aa05153a0ca.

Throughout Pappa's childhood, people would maliciously tell Pappa the real story, even though he was just a child. *See* App. A54. Pappa had several incidents during his childhood where he got into fights with kids who said cruel things to him or his sister, Kristina, about their father. To make matters worse, when Pappa's father died, family friends connected with organized crime

---

[3] "App." refers to the Appendix attached to this motion for compassionate release. "Doc." refers to the district court's docket sheet and filing number. *See United States v. Pappa, et al.*, No. 1:97-cr-01005-RJD-1 (E.D.N.Y.). "Trial Tr." refers to the trial transcripts in this case.

[4] Various family friends, referred to by Pappa as "uncles" in his childhood, were also members of Italian organized crime. Several were later convicted of crimes and one such "uncle" was similarly shot in front of his house a several years later.

largely abandoned the Pappas, and that was difficult for Pappa, as he looked up to these men. *See id.*

Pappa's stepfather, Frank Esposito, also set a bad example during Pappa's childhood. Esposito was arrested for drug dealing and tax evasion and, in 1987, the DEA raided Pappa's home, seizing everything, including the college savings funds that Pappa and his sister Kristina received as gifts when they were kids. *See id.* The DEA investigation led kids at Pappa's school to bully him. As Kristina Pappa writes, "Kids are cruel. They brought the papers into school. They talked about us. They criticized our parents. [John] had a hard time. He learned incredibly young that very few people stick by you when things get bad." *Id.*

Esposito was eventually convicted and sentenced to prison. *See id.* He was incarcerated in the late 1980s and did not return to the Pappa house until 1993. By then, Pappa had lost his second father figure and any form of security. Pappa then turned to the wrong people (organized crime members), and the Colombo crime family took advantage of a lost kid.

### B. While in his late teens and early 20s, Pappa commits crimes in an attempt to impress members of the Colombo organized crime family.

By his late teens, Pappa became an associate of the Colombo family that was aligned with the Persico faction, and he was also a member of a crew led by Eric Curcio. *See* Presentence Investigation Report ("PSR"), ¶ 16. Pappa murdered the acting underboss of the Colombo crime family, and then was involved with three additional murders.

In the fall of 1993, Joseph Scopo was acting underboss of the Orena faction of the Colombo family. PSR ¶ 17. During the same time frame, several senior members of the Persico faction were incarcerated at the Metropolitan Correctional Center in New York City. *Id.* The Persico faction relied on younger associates to carry out orders from prison. Trial Tr. 601. Bruce Mouw, an FBI

Expert, testified that if a person received an order to kill someone from someone higher up in organized crime in your own family, that person must follow the order, otherwise you're "killed in return." Tr. 894–895. The Colombo family recruited young associates to commit murders and the young associates would carry out the murders because "these young kids are wannabes," and they aspired "to be members of the mob." Trial. Tr. 923–925.

Eric Curcio ran the crew that Pappa ran with and he visited senior Colombo family members at the MCC, where he received an order to kill someone on the Orena side of the Colombo family war. PSR ¶ 17. Joseph Scopo was later killed by gunfire and a dispute arose over who fired the fatal shots killing Scopo. PSR ¶ 22. John Sparacino, a member of the Curcio crew, claimed to have fired the fatal shots. PSR ¶ 21. But Pappa claimed that he was the one who killed Scopo because Sparacino had sprayed Scopo's car with gunfire but missed. *Id*. at ¶¶ 21–22. As a young and immature youth looking for acceptance from the wrong kinds of people, Pappa eagerly sought to impress members of the Colombo family.

Calvin Hennigera (Pappa's co-defendant) and Pappa later murdered Sparacino for trying to take credit for the Scopo hit. PSR ¶¶ 14-36. Ronaldo Rivera was also a member of Curcio's crew. Curcio and Pappa later murdered Rivera. PSR ¶¶ 28–31. The final murder involved Curcio, who was killed by Pappa in 1994. PSR ¶¶ 37–40.

Pappa was also convicted with Hennigar of possessing and using firearms and of distributing narcotics. PSR ¶¶ 41–44. Pappa and Hennigar operated a marijuana and cocaine business out of Hennigar's house on Staten Island. After a search of the Staten Island residence, law enforcement officers seized drugs and other firearms.

**C. Pappa is convicted and sentenced to life imprisonment and, after his direct appeal, Pappa has not challenged his convictions or sentence via post-conviction proceedings.**

Following a jury trial, Pappa was convicted on multiple charges arising out of various criminal activities connected with the Colombo organized crime family. Pappa was convicted of: (1) racketeering and conspiracy to racketeer, in violation of 18 U.S.C. §§ 1962(c) and (d) (Counts one and two); (2) three counts of first-degree murder (Counts three, four, and six); (3) possession and use of a firearm during the commission of a crime of violence, in violation of 18 U.S.C. § 924(c)(1) (Counts five, eight, and eleven); and (4) narcotics distribution and conspiracy to distribute narcotics, in violation of 21 U.S.C. §§ 841(b)(1)(A), (C), and (D) (Counts nine and ten). *See* Doc. 13 (Superseding Indictment).

Pappa's sentencing range under then-mandatory Sentencing Guidelines called for a life sentence. *See* PSR ¶¶ 103, 132. Pappa was sentenced to six concurrent terms of life imprisonment for the RICO, narcotics, and murder counts; ten-year terms for the two murder conspiracy counts; and consecutive five-year and twenty–year terms on the two firearms counts. *See* Doc. 188 (Judgment).

Pappa appealed his conviction to the Second Circuit, which affirmed the judgment. *See United States v. Pappa*, 37 F. App'x 551 (2d Cir. 2002). Pappa did not file a 28 U.S.C. § 2255 motion, nor any other post-conviction motion. Instead, he has quietly done his time and focused on his own self-improvement.

**D. Pappa's remarkable efforts at rehabilitation while serving time in the Federal Bureau of Prisons.**

Despite multiple life sentences and no hope for a return to society, Pappa embarked on an extraordinary journey of education, maturity, and self-reflection. Pappa has had over 24 years of

clear conduct in the BOP, which "[g]iven the realities of incarceration in a federal penitentiary, particularly under the specter of a life sentence, this record can only be viewed as exemplary." *United States v. Russo*, No. 90-CR-1063, 2022 WL 17247005, at *5 (E.D.N.Y. Nov. 28, 2022). As the BOP Summary Re-entry Plan notes, "This [24 years of clear conduct] is an exceptional accomplishment on his part. He continues to excel [as] a role model in many areas, including institutional conduct. He maintains a positive rapport with staff and other inmates alike . . . His institutional conduct history is one to be modeled after." App. A8.

Pappa has programmed within the BOP at a level that few prisoners have reached. He has completed over 3,500 hours of programming, completed 268 course certificates, acted as positive role-model for other prisoners by mentoring them, was selected by staff to be a Mental Health Companion for other prisoners, and has gone to great lengths to prepare for a successful release back into society. *See* BOP Summary Reentry Plan, App. A7-A8. Pappa recently completed a 100-hour Pre-Release Re-Entry program and a 22-hour Focus Group, which included "focusing on violence prevention, criminal thinking, rational thinking, and communication skills." *Id*. at A7. Pappa has also created 22 courses that he teaches to other prisoners. *Id*. In recognition of this extraordinary rehabilitative record, Pappa has "received numerous letters of commendation from staff at multiple institutions, which is a feat not regularly witnessed." *Id*. at A9.

## ARGUMENT

A district court can modify a term of imprisonment and grant compassionate release if it finds that "extraordinary and compelling circumstances" warrant release and that any release complies with the "[sentencing] factors set forth in section 3553(a) to the extent they are applicable." 18 U.S.C. § 3582(c)(1)(A). When considering whether extraordinary and compelling reasons exist, "district courts today are no longer confined to the reasons set forth by the Bureau

of Prisons Director but are instead free to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them." *United States v. Jones*, 17 F.4th 371, 374 n.3 (2d Cir. 2021) (quoting *United States v. Brooker*, 976 F.3d 228, 235–37 (2d Cir. 2020)). A district court's discretion to find extraordinary and compelling circumstances is "broad," *Brooker*, 976 F.3d at 237; indeed, "[t]he only statutory limit on what a court may consider to be extraordinary and compelling is that rehabilitation alone shall not be considered an extraordinary and compelling reason." *Id.* at 237–38 (quoting 28 U.S.C. § 994(t)).

There are four circumstances that, individually or cumulatively, present extraordinary and compelling reasons warranting a sentence reduction here. *See United States v. Newton*, 996 F.3d 485, 489 (7th Cir. 2021) (holding that the district court abused its discretion by failing to consider the defendant's extraordinary and compelling circumstances "cumulatively"). First, Pappa's upbringing and youth at the time he committed the crimes—when his immaturity and susceptibility to influence from organized crime members was at its zenith—makes him less culpable. *See United States v. Chan*, 90-CR-1019-4 (RJD), Doc. 553, at 13–14 (E.D.N.Y. Jan. 6, 2022) (Dearie, J.) (granting compassionate release to prisoner convicted of murder due, in part, to the prisoner's "youth at the time of his offense"). Second, Pappa's youth at the time of his offense makes his sentence of life imprisonment unusually long and creates a sentencing disparity in light of nationwide sentencing practices for those convicted of murder in federal court. Third, the Court could not consider Pappa's mitigating circumstances of youth and his upbringing at the time of sentencing because the life sentence was required under the then-mandatory Sentencing Guidelines, which have now been declared advisory by the Supreme Court. And fourth, Pappa's demonstrated record of rehabilitation is unmatched.

Pappa's release from custody is also consistent with the goals of sentencing under 18 U.S.C. § 3553(a). *See Jones*, 17 F.4th at 374 (explaining that "extraordinary and compelling reasons are necessary—but not sufficient—for a defendant to obtain relief under §3582(c)(1)(A)," and that "a district court must also consider the factors set forth in section 3553(a) before granting relief"). While Pappa's crimes were of the most serious nature, he has been adequately punished by serving over 25 years in federal prison, and reducing his sentence so that one day he will be released will not jeopardize public safety because Pappa is completely rehabilitated and will be an asset to any community in which he resides.

## I. PAPPA HAS EXHAUSTED ADMINISTRATIVE REMEDIES THROUGH THE FEDERAL BUREAU OF PRISONS.

On October 11, 2021, Pappa filed a request with the Warden at FCI Edgefield[5] and sought compassionate release on the basis of his youth and upbringing, the length of his life sentence, and his extraordinary rehabilitation efforts. *See* Administrative Request, App. A16. The Warden never responded to that request. As a result, Pappa has exhausted the BOP's administrative remedies and he has met the exhaustion requirement. *See* 18 U.S.C. § 3582(c)(1)(A) (stating that exhaustion is met when "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility" has occurred).

## II. PAPPA HAS FOUR EXTRAORDINARY AND COMPELLING FACTORS WARRANTING A SENTENCE REDUCTION.

Pappa has four extraordinary and compelling circumstances that, individually and cumulatively, militate against his continued life imprisonment and warrant a sentence reduction.

---

[5] Pappa is incarcerated at FCI Edgefield, a medium-security prison, in South Carolina. Notably, Pappa was permitted to transfer to a medium-security facility upon BOP staff recommendation, requiring a waiver of ordinary classification factors. *See* BOP Request for Transfer, App. A37. This waiver was granted in part based on Pappa's "exceptional" conduct. *Id.*

**A. Pappa's upbringing and youth at the time of the offense makes him less culpable.**

Since Pappa was sentenced in 1999, the Supreme Court has made clear that "youth matters in sentencing." *Jones v. Mississippi*, 141 S. Ct. 1307, 1314 (2021). In *Miller v. Alabama*, the Court held that a juvenile convicted of a homicide offense could be not sentenced to a mandatory life sentence without parole because "a lifetime in prison is a disproportionate sentence for all but the rarest children, those whose crimes reflect 'irreparable corruption.'" 567 U.S. at 479–480. The Court has also recognized that a young defendant's "heinous crime" is not "evidence of irretrievably depraved character," and that defendants who commit crimes as juveniles are less culpable. *Roper v. Simmons*, 543 U.S. 551, 570 (2005).

The idea that youth at the time of the offense equals lessened culpability has emerged through social and brain science. *See* M. Eve Hanan, *Incapacitating Errors: Sentencing and the Science of Change*, 97 DENVER L. REV. 151, 162–63 (2019) ("Research in neurobiology and developmental psychology has shown that the brain doesn't finish developing until the mid-twenties, far later than was previously thought. This accords with policy arguments and social science on the eighteen- to twenty-five-year-old age cohort.") (cleaned up); *see also id*. at 171 ("Research in multiple fields demonstrates that change in adulthood is the norm rather than the exception, and that these changes occur not just in response to the aging process but in response to environmental stimuli at any point in life.").

Several courts, including this Court, have found upbringing and youth at the time of the offense to be an extraordinary and compelling circumstance. *See, e.g.*, *See United States v. Haynes*, 456 F. Supp. 3d 496, 515 (E.D.N.Y. 2020) (Dearie, J.) (reducing a defendant's stacked sentences under § 924(c) in light of defendant's young age and the incredible length of the then-mandatory

sentence); *Chan*, Doc. 553, at 13–14 (Dearie, J.) (granting compassionate release to a prisoner convicted of murder due to the prisoner's "youth at the time of his offense"); *United States v. Ramsay*, 538 F. Supp. 3d 407, 426 (S.D.N.Y. 2021) (finding that "Ramsay's sentence of life imprisonment is utterly inconsistent with the goals of criminal sentencing," and that his "youth at the time of the offense, his upbringing, and his demonstrated rehabilitation, taken together, are extraordinary circumstances"); *United States v. Glynn*, 2022 WL 562652, at *5 (S.D.N.Y. Feb. 24, 2022) (granting compassionate release to a former leader of the Bloods who ordered a murder at age 22 and finding that youth at the time of the offense was extraordinary and compelling).

A similar analysis applies here. Pappa was 17 to 22 years old when he was involved in organized crime and committed his offenses. People at that age are immature, and the "neuroscientific explanation" for such immaturity is lessened brain function in the frontal lobes "home to key components of the neural circuitry underlying executive functions such as planning, working memory, and impulse control, [and] are among the last areas of the brain to mature." *Ramsay*, 538 F. Supp. 3d at 418. This immaturity implies that Pappa's culpability for committing his offenses should be lower than that of a mature adult who commits the same crimes.

Susceptibility is another hallmark of Pappa's crimes. Pappa was raised in a life of organized crime and drug dealing, and after his father was killed and his stepfather was incarcerated, he began to look up to organized crime members to fill the fatherhood gap. Neuroscience also explains why he committed crimes in the pursuit of "credit" so as to impress members of the Colombo crime family. *See Roper*, 543 U.S. at 569 (noting the "area of difference [between juveniles and adults] is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"); *Ramsay*, 538 F. Supp. 3d at 423 (explaining the concept of "hot cognition," in which "decisions made in the presence of peers—also lessens the value of

deterrence because adolescents' immaturity, recklessness, and impetuosity make them less likely to consider potential punishment") (citing *Miller*, 567 U.S. at 472).

Salvageability is the next indicator of lessened culpability for people who commit crimes in their late teens and early twenties. *See Roper*, 543 U.S. at 570 (holding that the "third broad difference [between juveniles and adults] is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed."). Pappa is not the same reckless, immature, and impulsive youth that committed heinous offenses. He has matured, self-reflected on why he committed crimes, and escaped that period of his life by taking over 3,500 hours of rehabilitative courses, and spending countless hours mentoring and assisting those in prison. *See infra*, Section D. The best proof that Pappa is salvageable comes from the unbiased people closest to him—BOP staff who have witnessed his growth. *See id.* Pappa is not the same; his sentence should reflect that growth.

The last indicator of diminished culpability for young offenders is dependency upon others for most or all of their lives. *See Roper*, 543 U.S. at 569 (noting that juveniles lack the freedom that adults have to extricate themselves from a criminogenic setting). Pappa was in a setting in which he was expected to obey orders, even orders to murder. If he did not follow orders from the Colombo crime family, he himself faced potential death (Pappa knew his father was killed for operating outside of orders). That powerful disincentive to disobeying an order means he has lower culpability than those who commit murder without having to follow the orders of organized crime members.

Few people in Pappa's position could have said no to an order from members of the Colombo crime family. His upbringing and lack of a father figure deprived him of needed stability and were the impetus for him to join organized crime. He looked up to organized crime members

because that was what he saw in his own childhood. Once the Colombo crime family and his crew ordered his participation in a hit, Pappa had little chance to say no. His vulnerability, upbringing, and youth at the time of the offenses makes him considerably less culpable—just like the defendants in *Chan*, *Ramsey*, and *Glynn*. As Judge Rakoff put it, "Adolescents' immaturity, their susceptibility to peer influence, and their dependence mean their irresponsible conduct is not as morally reprehensible as that of an adult," and "[t]hus, a just punishment for an adolescent is usually less severe than a just punishment for a similarly situated adult." *Ramsay*, 538 F. Supp. 3d at 423 (citing *Roper*, 543 U.S. at 570). So too here.

**B. Pappa's life sentence will amount to an unusually long sentence and will result in a sentencing disparity when compared against other sentences for murder.**

Because Pappa was sentenced to life imprisonment and that sentence will be extraordinarily long if he attains his life expectancy. The average life expectancy for a man Pappa's age is 79.61 years. *See* Social Security, Actuarial Life Table (2019), https://www.ssa.gov/oact/STATS/table4c6.html. Pappa has spent roughly 55% of his life in prison. Should he reach age 79, he will have spent 71% of his life in prison and will have served over 56 years in prison. The sheer length of sentence Pappa has served and will serve—even for murder convictions—is extraordinarily long.

Pappa has already served 25 years in custody, which is above the median for those sentenced for murder, a factor that courts have considered in granting compassionate release. *See, e.g.*, *United States v. Tellier*, No. 92 CRIM. 869 (LGS), 2022 WL 1468381, at *4 (S.D.N.Y. May 10, 2022) ("Defendant's life sentence is not in line with nationwide sentences for murder and other serious crimes."); *United States v. Qadar*, No. 00 Cr. 603, 2021 WL 3087956, at *12 (E.D.N.Y. July 22, 2021) (noting that the average federal murder sentence in fiscal year 2020 was

approximately 21 years); *United States v. Lugo*, No. 01-CR-922 (NG), 2022 WL 732153, at *10 (E.D.N.Y. Mar. 11, 2022) ("Notably, a 25-year sentence is still higher than the recent average federal sentence for murder, which is slightly over 20 years.") (citing U.S. Sentencing Comm., *Interactive Data Analyzer*, https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited Dec. 16, 2022) (showing the median sentence length for murder for fiscal years 2015 through 2021 was 240 months, the median length of imprisonment was 240 months, the average sentence length was 262 months and the average length of imprisonment was 263 months)). Keeping Pappa in prison for life thus creates an unwarranted sentencing disparity between his sentence and those of others serving sentences for murder. *See United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007) (noting 18 U.S.C. § 3553(a)(6) requires a district court to consider "nationwide sentence disparities"). More directly, keeping Pappa in prison for life creates a disparity between his sentence and those of others who have been granted compassionate release from a life sentence for murder, given that Pappa presents circumstances at least as extraordinary and compelling as those others. *Cf., e.g.*, *Chan*, 90-CR-1019-4 (RJD).

### C. This Court was unable to consider the mitigating circumstances of Pappa's youth and the impact of his family's involvement in organized crime at sentencing because of the mandatory U.S. Sentencing Guidelines.

Pappa was sentenced in 1999, when the U.S. Sentencing Guidelines' ranges were mandatory and the grounds for departures from them were few and far between. *See United States v. Jaber*, 362 F. Supp. 2d 365, 371 (D. Mass. 2005) (explaining how mandatory Guidelines and departures operated prior to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), making the Guidelines advisory). When this Court sentenced Pappa in 1999, the social and brain science regarding the culpability of youths who commit crimes was not as robust, and it was a prohibited ground for departure under then-mandatory Guidelines. *See* U.S. SENTENCING

14

COMMISSION, PRIMER ON DEPARTURES AND VARIANCES, 15 (2022) ("Section 5K2.0(d)(1) forbids relying on certain offender characteristics outlined in Chapter Five, Part H as the basis for a departure: [such as] '[l]ack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing.'"). Consequently, this Court was unable to weigh the mitigating circumstances of Pappa's youth and immaturity (and hence his reduced culpability) in deciding whether to impose a sentence of less than life imprisonment. *See United States v. Facey*, No. 96-CR-912 (ERK), 2021 WL 3117439, at *2 (E.D.N.Y. July 20, 2021) (granting compassionate release for defendant who committed seven armed robberies from age 18 to 20 and who received a sentence of 81 years, where the term was "longer than [the Court] would likely impose if . . . sentencing a young man in Facey's shoes today").

Other courts have found that mandatory sentences—especially those precluding the consideration of mitigating circumstances—can be extraordinary and compelling grounds for a sentence reduction. *See, e.g.*, *United States v. Williams*, No. CR 91-559-6 (TFH), 2021 WL 5206206, at *7 (D.D.C. Nov. 9, 2021) (granting compassionate release in part because in handing down a "mandatory life without parole sentence, the sentencing Court was unable to take into consideration mitigating facts" about the "hallmark features of youth," including defendant's youth, upbringing, intellectual capacity, and his history of abuse (at the time unknown to the Court)"); *Russo*, 2022 WL 16627450, at *6 ("Had Russo been sentenced today, the guidelines range would still be life. However, the sentencing court would not be constrained to impose a life sentence and could more meaningfully account for the other sentencing factors at play."); *United States v. Jones*, 482 F. Supp. 3d 969, 981 (N.D. Cal. 2020) (granting compassionate release in part on the "sea changes" in sentencing law wrought by the Supreme Court's decision in *Booker*"); *United States v. Stanback*, 377 F. Supp. 3d 618, 625 (W.D. Va. 2019) ("The court finds that it has

authority under 18 U.S.C. § 3582(c)(2) to modify Stanback's sentence, taking into account . . . *Booker* and the considerations set forth in 18 U.S.C. § 3553(a).").

Being sentenced to life without parole under a mandatory Guidelines regime that the Supreme Court later concluded was unconstitutional (and which prevented the consideration of mitigating factors) is an extraordinary circumstance.

### D. Pappa has an extraordinary record of rehabilitation.

The BOP's "summary reentry plan – progress report" states the obvious: "Mr. Pappa's program participation is nothing short of exemplary." App. A7. While incarcerated, Pappa has spent countless hours successfully completing rehabilitation programming. His efforts at rehabilitation are far beyond the norm for federal prisoners. That Pappa has made such strides while serving a sentence of life imprisonment, with no incentive for his exceptional conduct, is even more remarkable. *See Lugo*, 2022 WL 732153, at *8 ("Lugo's commendable behavior is especially significant because his life sentence eliminated any extrinsic motivation to earn good time credit and to acquire new skills and knowledge."); *see also Chan*, 90-CR-1019-4 (RJD), Doc. 553, at 13–14 (granting compassionate release to prisoner with an initially poor prison record).[6]

Pappa's rehabilitation is also demonstrated by the numerous awards and certificates bestowed upon him by the BOP. Pappa received an "Award of Excellence" due to his "four years

---

[6] Courts have granted compassionate release motions involving defendants with far worse disciplinary records. *See, e.g.*, *United States v. Haynes*, 456 F. Supp. 3d 496, 503–05 (E.D.N.Y. 2020) (granting compassionate release to a defendant who had five disciplinary events, including possession of a weapon, during his nearly three decades of incarceration); *United States v. Millan*, No. 91-cr-685 (LAP), 2020 WL 1674058, at *11 (S.D.N.Y. Apr. 6, 2020) (granting compassionate release to a defendant based in part on his having only three minor disciplinary infractions over the course of his almost 30 years behind bars). Other courts have granted compassionate release involving defendants with similarly short disciplinary records while in custody. *See, e.g., United States v. Fisher*, 493 F. Supp. 3d 231, 237 (S.D.N.Y. Oct. 9, 2020) (noting that the defendant's "clean disciplinary record" weighed in favor of compassionate release); *United States v. Britton*, No. 17-cr-260 (LTS), 2020 WL 4586799, at *1 (S.D.N.Y. Aug. 10, 2020) (remarking on the defendant's "unblemished disciplinary record while confined").

of selfless leadership and dedication as a Victim Impact Facilitator, who promotes acceptance of responsibility, genuine remorse, empathy, and making amends." App. A12. He received Challenge Application Awards in both 2011 and 2013. App. A13 & A14. The Challenge Program was "founded upon the principles of honesty, responsibility, discipline, and ethics. It is a cognitive behavioral program that teaches offenders how to think before reacting." Letter of Marwin Reeves (a former BOP correctional treatment specialist), App. A18; *see also* BOP Psychology Data System, App. A39-A41, A47-A49 (describing the Challenge Program in more detail).

Pappa has not just striven for self-improvement; he further strives to be a servant leader. He has created and taught 22 self-improvement courses to other prisoners. He is also a Mental Health Companion, a "trained inmate who provides assistance and support to inmates with mental illness under the direction of the Psychology Services Department." Letter of L. Diaz-Marrero (BOP Inmate Companion Program Coordinator), App. A27. Pappa's rehabilitation is demonstrated through his prolific mentoring of other prisoners.

Perhaps the best example of Pappa's rehabilitation comes from the numerous supporting letters provided by BOP staff. *See United States v. Rodriguez*, 492 F. Supp. 3d 306, 312 (S.D.N.Y. 2020) ("The Court finds these letters—written by the unbiased people who have spent more time with Rodriguez than anyone else—to be powerful evidence of his rehabilitation."); *Russo*, 2022 WL 16627450, at \*4 (granting compassionate release to a member of the Colombo crime family convicted of conspiracy to murder in part because he presented "convincing evidence of his rehabilitation and character" through "two letters" submitted by BOP staff).

Pappa has submitted 19 letters of support from former and current BOP staff, an extraordinary amount of support from those—unlike the federal prosecutors who will almost

certainly oppose his release—who have witnessed Pappa for the past 25 years. Below is a sampling of supportive quotes from BOP staff who have witnessed Pappa's change first-hand:

> It may seem strange to those reading this letter why a retired federal officer would consider supporting someone like John . . . I worked with thousands of inmates in the 22 years but there were four incredible gentlemen that worked side by side with me through those years [that he supported] . . . [and explaining that Mr. Pappa was one of them].

Letter of Rod A. Joseph (former BOP Recreation Specialist), App. A19; *see also* App. A45.

> [Pappa] is the [epitome] of a model inmate. He has displayed behaviors indicative of favorable re-entry and low-level recidivism probability. All clinical evidence appears to indicate Mr. Pappa will release to lead a prosocial lifestyle, free of substance abuse and criminal behavior.

Letter of Shana Goodell (BOP Drug Treatment Specialist), App. A20.

> My 20+ years of experience tells me Mr. Pappa has prepared himself to reenter society; and if given a second chance, I am certain he will remain dedicated to accomplishing positive goals.

Letter of Cameron Ellison (BOP Recreational Specialist), App. A25.

> Upon [Pappa's] arrival, I had concerns with regard to his drop in security, especially after reading his case, which is terrible. After supervising him for over seven years, it is evident that he is not the reckless, misguided teen I read about. On the contrary, he is now a mature, respectful, and responsible man . . . In my twenty-two years working for the Federal Bureau of Prisons, I have only felt comfortable writing a character letter for one other man besides Mr. Pappa.

Letter of M. Werts (BOP Supervisor), App. A26.

> [Pappa] exemplifies all the characteristics of a good neighbor and positive role model at FCI Edgefield. I say this based on over twenty-four years of Correctional experience with inmates that do not display those characteristics . . . Despite Pappa's offenses, I would not hesitate to employ him. His work ethic is the best out of all the inmates supervised by me during my twenty plus years career in the Federal Bureau of Prisons.

Letter of R. Clemmons (BOP Recreational Specialist), App. A28.

Even the Associate Warden at USP Allenwood, a former law-enforcement officer with a 30-year-long BOP career, was "compelled to submit [a] letter of support" for Pappa despite being "keenly aware" of the details of Pappa's crime. Letter of Charles S. Smith, App. A51; *see also id.* at App. A50 ("Pappa is one of only a handful of prisoners for whom I would consider submitting such a letter"). These 19 letters from BOP staff are illustrative of the impact Pappa has had on everyone around him.

Pappa also has the support of several current and former prisoners. Adam Clausen, who was serving a 213-year federal prison sentence when granted compassionate release, *see United States v. Clausen*, No. CR 00-291-2, 2020 WL 4260795, at *1 (E.D. Pa. July 24, 2020), fully supports Pappa's release: "There are few people within the federal prison system who I believe have genuinely transformed their lives and earned the right to have their sentence reconsidered; Mr. John Pappa is one of those rare, deserving individuals whose substantial contributions to his community and numerous personal achievements warrant such a review. My decision to write this letter attesting to his good character and high integrity is based on my daily interactions with him over the course of the many years he and I lived together." App. A30. Torry Davis, a current prisoner at FCI Edgefield, also wrote a supporting letter for his "teacher and mentor Mr. Johnny Pappa" and that he felt "elated in expressing to you the character of Mr. Pappa and how he has played a major role in my transformation." App. A31. And Stephen Baker writes that Pappa "has been the single most positive influence in my life, upon arriving at Edgefield." App. A24.

Pappa's 25-year effort at rehabilitation is extraordinary and should be considered in conjunction with the other extraordinary grounds. *See Brooker*, 976 F.3d at 238.

**III. The 18 U.S.C. § 3553 Sentencing Factors Also Favor a Reduction of Pappa's Sentence to Less than Life Imprisonment.**

Once a person in custody has presented extraordinary and compelling reasons for a sentence reduction, the court "may reduce the term of imprisonment" after it considers "the factors set forth in [18 U.S.C. §] 3553(a)." The § 3553(a) sentencing factors support a reduction in sentence here because Pappa was less culpable than a normal defendant, has already served 25 years of imprisonment, and, if released, he will be a productive and law-abiding citizen.

### A. While these were undoubtedly serious crimes, Pappa is not as culpable due to his youth and immaturity at the time of the offenses.

The "nature and circumstances of the offense and the history and characteristics of the defendant" support a sentence reduction. 18 U.S.C. § 3553(a)(1). To be sure, the gravity of Pappa's offenses cannot be overstated. *See Lugo*, 2022 WL 732153, at \*9 ("There is no crime more serious than murder."). But as other courts have found, committing murder does not mean that the severity and nature of the crime always prevails over other § 3553(a) considerations. *See, e.g.*, *Russo*, 2022 WL 16627450, at \*7 ("The argument can plausibly be made that no one convicted of murder should ever have their sentence reduced and that [a life sentence implies that] the judge intends that the defendant should die in prison . . . Even though I am similarly troubled by the fact that Russo orchestrated two murders, I do not subscribe to that unyielding punitive concept.").

Pappa is not as culpable as a run-of-the-mill murder defendant. For one, Pappa's upbringing in a family of organized crime, in which his father was killed while Pappa was young, and his stepfather was incarcerated for a considerable period of time, is a mitigating factor. *See* Eric Martin, *Hidden Consequences: The Impact of Incarceration on Dependent Children*, 278 Nat'l Inst. Just. J. 1 (2017) (noting that children of incarcerated parents run greater risks of health and psychological problems, and lower economic well-being and educational attainment).

Pappa's age at the time of the offenses means he was less culpable than other defendants convicted of murder. *See supra*, Section A, at 9-12; *see also United States v. Brown*, No. 05-CR-538 (JSR), 2022 WL 3369709, at *6 (S.D.N.Y. Aug. 15, 2022) (granting sentence reduction for defendant convicted of murder "based on Brown's age . . . and cognitive impairment at the time of the offense [and the] strong evidence of post-conviction rehabilitation"); *United States v. Rengifo*, 569 F. Supp. 3d 180, 195 (S.D.N.Y. 2021) (finding that the combination of Rengifo's youth when he joined a Columbian paramilitary organization (FARC) and was involved in a kidnapping made him less culpable than other offenders and that his considerable rehabilitation rose to the level of extraordinary and compelling reasons that support a sentence reduction).[7]

Pappa's crimes, while heinous, do not prevent this Court from finding him less culpable than other murder defendants and thus imposing a sentence of less than life imprisonment.

**B. Pappa has served 25 years in federal prison, and a sentence of less than life imprisonment that permits Pappa's release would still reflect the seriousness of the offense, promote respect for the law, and provide just punishment and deterrence.**

A sentence reduction even to time served would still reflect the seriousness of the offense and provide just punishment and deterrence. See 18 U.S.C. § 3553(a)(2)(A). Pappa has served over 25 years in federal prison, much of which was served in maximum security prisons, where the rate of violence is high. *See United States v. Flores-Mendez*, No. 13 CRIM. 31 (LGS), 2022 WL 16549225, at *3 (S.D.N.Y. Oct. 31, 2022) (noting that "violence is common" in maximum security

---

[7] Pappa's murders were not directed at the public at large, but at organized crime members. *See Russo*, 2022 WL 16627450, at *8 ("At the risk of sounding cynical, there are different types of murders with different degrees of culpability. For example, there are murders of passion and murders of revenge. Here the murders were not directed at the public at large but were internecine executions of ruthless rival gang members.").

prisons). Incarceration for 25 years is considerable punishment. *See United States v. Tellier*, No. 92 CRIM. 869 (LGS), 2022 WL 1468381, at *4 (S.D.N.Y. May 10, 2022) ("The substantial amount of time that Defendant has served also weighs in favor of a sentence reduction.); *Lugo*, 2022 WL 732153, at *10 (same).

A 25-year sentence will also provide a deterrent effect, if any exists. *See* David Roodman, *The Impacts of Incarceration on Crime*, OPEN PHILANTHROPY PROJ. (Sept. 2017) (noting that economists and scholars are increasingly clear that there is "little convincing evidence that at today's margins in the US, increasing the frequency or length of sentences deters aggregate crime"); Shon Hopwood, *Second Looks & Second Chances*, 41 CARDOZO L. REV. 101, 113–14 (2019) (arguing that there is no loss of deterrence when federal courts reduce long sentences under the federal compassionate release statute). Put differently, a sentence of 25 years, largely served in maximum-security prisons, is a steep punishment that reflects the seriousness of the offense, promotes respect for the law, deters others from committing the same offenses.

### C. Pappa is a changed man and rehabilitated, and there is ample proof that a sentence of life imprisonment is not needed to protect the public, and Pappa has a viable release plan.

Pappa's prison record, his maturity, and self-reflection all indicate that reducing his sentence and allowing him to be released from custody will not negatively impact public safety. *See* 18 U.S.C. § 3553(a)(2)(A) (stating that the need for the sentence imposed "to protect the public from further crimes of the defendant"); *Pepper v. United States*, 562 U.S. 476, 491 (2011) ("[E]vidence of post-sentencing rehabilitation may plainly be relevant to the history and characteristics of the defendant."); *Russo*, 2022 WL 16627450, at *8 ("[R]ehabilitation is a factor in combination with others for . . . § 3553(a) considerations.").

For starters, even the BOP recognizes Pappa's extremely low risk of recidivism. The BOP has developed the PATTERN Score to assess a prisoner's rehabilitation while incarcerated and evaluate any potential risks of recidivism upon their release. *See* Federal Bureau of Prisons, PATTERN Risk Assessment, https://www.bop.gov/inmates/fsa/pattern.jsp (last visited Dec. 16, 2022). The DOJ has noted that prisoners who have a PATTERN score in the low category have a 98.2% chance of not recidivating upon release; for people in the minimum category the percentage of non-recidivating prisoners is 99.4%. *See* U.S. DEPT. OF JUSTICE, THE ATTORNEY GENERAL'S FIRST STEP ACT SECTION 3634 ANNUAL REPORT, 24 (Dec. 2020), https://www.ojp.gov/Attorney-Generals-First-Step-Act-Section-3634-Annual-Report-December-2020. The score range for low-risk prisoners is 12 to 32 for the general score, and 8 to 24 for the violent score; while the score range for minimum-risk prisoners is -22 to 11 for the general and -11 to 7 for violent. *See* NAT. INSTITUTE FOR JUSTICE, 2021 REVIEW AND REVALIDATION OF THE FIRST STEP ACT RISK ASSESSMENT TOOL, 19 (Dec. 2021), https://www.ojp.gov/pdffiles1/nij/303859.pdf. Pappa's general score of 13 and his violent score of 10 places him at the low-end of the low-risk category. *See* Pappa FSA Risk Assessment Score Sheet, App. A11. When Pappa turns 51 in 2025, he will drop into the minimum-risk category and his recidivism risk, according to the BOP, will be under 1%. The PATTERN score thus shows that Pappa is an extremely low risk of recidivism.

Pappa's own letter further demonstrates that he is both remorseful for his actions as a youth and prepared to lead a productive and law-abiding life upon release. Pappa has "come to fully understand and appreciate the gravity of [his] conduct." Letter of John Pappa, App. A52. Pappa acknowledges that he cannot change what he did, so he changed and "worked hard at making amends and paying down my debt to everyone. That work will never be done." *Id.* That heartfelt

letter shows Pappa's remorse and his willingness to make amend through preventing others from committing violence.

If released, Pappa will reside in rural South Carolina and would stay with his mother and family, who fully support his release. *See id.*; Letter of Kristina Pappa, App. A55. He will seek a job in drywalling or with prisoner reentry work. *See* App. A52. And Pappa is more than prepared for his release: "Through his exceptional program participation, including numerous programs in the Pre-Release program, Mr. Pappa has gone to great lengths in preparing for a successful release back into society" and has completed an "100 hour pre-release reentry correspondence course." BOP Summary Reentry Plan – Progress Report, App A3.

Pappa has a supportive family that will aid his reentry. As Pappa's sister, Kristina, writes, "If ever there was a redemption story, Jonathan's is it . . . There is not a mountain that I would not move to help Jonathan lead a moral and balanced life once he is home. I have the personal and financial resources to do so and I commit to you that I will." App. A53. And Pappa's 75-year-old mother, Klare Esposito, writes that her "only wish is to see my son come home someday soon." Letter of Klare Esposito, App. A58. Ms. Esposito writes: "We are all committed to helping [Pappa] in every way we can. He can come home and get right into our business, which is on our property in the south – far from [New York]." *Id.*

Pappa will benefit whatever community he returns to. He has a passion for helping at-risk youth. As Senior BOP Officer N. Baker noted, "I can hear his passion in helping at Risk Youth and rehabilitating them into becoming a positive force in today's society. The way he talks about it, there is no doubt in my mind that his heart is great, despite his crime . . . If there is anyone that deserves a second chance it is Mr. John Pappa." App. A21-A22; *see also* Letter of Cameron Ellison (BOP Recreational Specialist), App. A25.

24

In sum, the § 3553 factors, weighed in light of the circumstances now, show that a sentence of life is "greater than necessary" to comply with the goals of sentencing. *See* Hopwood, 41 CARDOZO L. REV. at 112 ("At the moment of sentencing, what can seem a sufficient but not greater than necessary sentence can, with hindsight and a record of the prisoner's rehabilitation, appear overly punitive and unnecessary.").

## CONCLUSION

This Court has had this case since its inception and understands the case and how the Section 3353(a) factors apply. As a result, Pappa makes the admittedly unusual request that the Court decide the motion before leaving the bench. Pappa presents extraordinary and compelling circumstances, and he respectfully requests that the Court grant his motion for compassionate release and reduce his sentence either to time served or less than life imprisonment.[8]

December 19, 2022

Respectfully submitted,

/s/ Shon Hopwood

Shon Hopwood[9]
Kyle Singhal
Hopwood & Singhal PLLC
1701 Pennsylvania Ave. NW
Suite 200
Washington, DC 20006
Telephone: (402) 889-0588

*Counsel for John Pappa*

---

[8] The Second Circuit has noted that compassionate release is a "misnomer," as § 3582(c)(1)(A) "speaks of sentence reductions," and that a district court could "reduce but not eliminate a defendant's prison sentence, or end a term of imprisonment but impose a significant term of probation or supervised release in its place." *Brooker*, 976 F.3d at 237.

[9] Motion for Pro Hac Vice pending before the Court.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on all counsel of record this 19th day of December, 2022, by filing a copy of the same with the ECF System of the U.S. District Court for the Eastern District of New York.

/s/ Shon Hopwood
Shon Hopwood

*Counsel for John Pappa*